Good morning ladies and gentlemen, welcome to the 5th Circuit Court of Appeals. We have one case to be submitted today on oral argument, and we begin with Mr. Norris. Students for Fair Admissions v. University of Texas at Austin, okay Mr. Norris. Good morning your honors, the bailiff please report. After my client won the Harvard case, it worked hard to ensure that universities could no longer see or track racial checkbox data during the admissions process. That relief was not a minor detail. These tools were how universities were giving large racial preferences and hitting precise racial balances every year. Taking that data away is one of the few concrete steps to stop universities with fuzzy, holistic admissions policies from considering race. So are you contending that the university is still considering race in contravention of Supreme Court authority? That is one of our arguments Judge Smith, that there is powerful presumptive evidence that they are considering it because they're asking and they're not blinding admissions officers at the decision point. We have other arguments. So the answer to my question is yes, that you contend they are doing so? Yes, that is one of our claims. There are other claims are even if they're not doing so, their refusal to adopt these safeguards is powerful evidence against voluntary cessation, which means our challenge to the original policy is still alive. And under the Brown II desegregation decisions, their refusal to adopt and to get rid of these tools of racial discrimination is something they have an affirmative duty to do, regardless of whether they're using race. With respect to what I'm thinking, I'm thinking of the old policy and the new policy, I guess. The old policy is the one that you originally challenged pre-Harvard. The new policy is they have made certain changes to the policy, and you are challenging both, as I understand it. I'm not sure your complaint challenges both because I'm not sure that it could have because of the timing of the events. But with respect to the new policy, if you were to prevail in some way here, do you envision going back to the district court and then going and taking discovery about how is the new policy actually being implemented? Yes, Your Honor, if that's necessary. We also moved for summary judgment because a few of our claims we think were just entitled to summary judgment now. So one path to the injunction that we're seeking, which would require them to blind themselves to this data during the admissions process, is to say that the original policy is unconstitutional, and that is a valid prophylactic remedy to that violation. That's all the court would need to say to get to that result. You wouldn't actually have to consider the new policy under that scenario. In the Harvard and the North Carolina cases, after the Supreme Court's decision, I'm not familiar with what happened after that, but was there an agreed injunction when you went back down to the district courts? Is that what happened? Sort of. So UNC's Board of Regents put together a very powerful presentation where they fully agreed that this information had to be removed from the process. And so we have that. We attached that to an agreed upon judgment in UNC. In Harvard, we negotiated this exact relief, did that through an agreed upon judgment. And in Yale, there was a stipulation of dismissal that laid out the exact same. Okay. So there's not an injunction, but there's an agreed judgment?  That says take the data out of the process? Correct. And one outcome of this case could have been a declaration saying that UT's refusal to do that is illegal. And then perhaps we wouldn't need an injunction if UT would comply with that declaratory judgment, but of course we have nothing here that requires them to make those reforms. Okay. Back to my earlier question. So you have mentioned that you're seeking a summary judgment, which plaintiffs usually don't, but that's what you are. And you answered my question, yes, that the university is still violating. So what is there in the summary judgment record, if anything, that would support that? If we were to decide that you're entitled to summary judgment, I'm not suggesting that we will do that. Well, on the part of this case that says they're still using race, or at least there's powerful evidence they're still using race, they didn't move for summary judgment. We did. We have not had discovery yet at all about UT's new policy. So I just want to put those caveats out there. The evidence that we have now is what the EEOC has long said, that if you ask for someone to check a box about their race, if you're an employer, for example, then there is a strong presumption that you are using that information to make employment decisions, unless you take full steps to blind the decision makers from that information at the decision point, or if you had some other valid reason for asking for that information. So UT is asking. UT is not blinding. UT has not given a single valid reason why they need access to individual checkbox data or they need an aggregate tool that shows you the racial makeup of the class at this point in time. So maybe I'm misunderstanding, but they say that they can validly use that data for recruitment and to comply with Texas law that requires the compilation of the data. So aren't those valid reasons? They are not. Our point is that you have to blind yourself to this information while admissions decisions are being made. Both of those interests are post-decision. So recruitment, they say, once we've already accepted someone, we want to use the racial data to reach out to students and make sure they enroll. That's after the admission process is over, the decision is made. The reporting is even further along. If you look at the Texas statute that requires reporting, those reports are due on December 1st. They are due about the cycle that just ended earlier in the spring. So they are due way later after the admissions process. Every school that takes federal funds has to report racial data to the federal government at least, and none of them are doing, to our knowledge, what UT is doing, which is giving this information to admissions officers while the process is open. Your requested remedy is what? Is it a firewall or is it something beyond that? What specifically is your requested remedy in an injunction? I think we need summary judgment, a declaration that the original policy is unconstitutional and the new policy is unconstitutional, and then the only injunctive relief would be an injunction that requires UT to block access to this information while the admissions process is ongoing, and this information being both the individual checkbox data and the aggregation tool that they give access to. It would be blocking it, if I understand, but correct me if I'm wrong, blocking it only from certain persons who are involved specifically in making the admissions decision? That's a good clarification. So only people with authority over who gets into UT, so people with authority over the admissions process. You could have recruiters that are in a separate office that get access. You could have someone who has no influence or say over who gets into UT be able to see it for record-keeping purposes, but it's the actual decision-makers who should not be able to see it. I mean, I think our judgment at Harvard is- What about alumni? Would they be able to see it? Obviously, alumni get involved in trying to urge who gets admitted and who doesn't. I would say no one with any role in deciding who gets in should get access to this information. They should be colorblind in the admissions process. There's no valid purpose to have this information after Harvard, so they should all be blocked. But they have plenty of ways to comply where there are people who are outside of that decision-making tree and get access for clerical purposes or any reporting purposes that they need it for. When you talked about remedy in answering Judge Smith's question, the first thing you mentioned was summary judgment. Are you asking that this court affirm some grand summary judgment or that it's remanded for the district court to make some determination about it? We think this court could either enter summary judgment itself or remand with a direction to enter summary judgment, and it depends on what claim we're talking about. But our challenge to the original policy, there's nothing to remand to the district court. UT is conceding that the original policy violates federal law. Have they conceded that? I believe so. I mean, if they haven't, then we certainly have a lot of case or controversy. But let me say this. Conceding may be too strong. We moved for summary judgment against the original policy. They presented no defense of the original policy on the merits, and neither did the interveners. So I think it's uncontested. Well, the case was, well, there was quite a bit of procedural developments after that, because didn't the district court dismiss on racial dichotomy grounds? It came up here. We reversed that. Sent it back. And then the case was put on pause? Right. Okay. For Harvard. And then Harvard was decided. We had a long back and forth with UT where we tried to convince them to do what everyone else is doing with respect to blinding themselves to this data. That failed. They moved to dismiss. The case has moved based on what they had done. We cross-moved for summary judgment on the original policy and the new policy. So the original — So there's summary — I'm just trying to understand. There's summary judgment pending with respect to both old and new. Correct. Is that right? Correct. Okay. And that's a little unclear from the district court's opinion what Judge Pittman decided about the new policy. It's not super clear. But at least the header of the first part of the analysis says that UT's existing admissions policy is lawful. That's something that Judge Pittman decided. We think that was premature, and we don't understand it, and there's not a lot of analysis in there. Well, the question is, I guess, how he could say it's moot and then make a declaration as to the merits. Is that your interpretation of what he did? That is a question that we have. Judge Pittman also said we are not entitled to an injunction under the standard for injunctive relief, not because the case is moot. So there's merits and non-merits both in that opinion. Perhaps the way to read that is the case is moot, dismissal, and the alternative, we should have lost on the merits anyway. Maybe that's what Judge Pittman was doing. So we think that that's right in front of this court. You've got those decisions from the district court, so you're free to reverse or enter summary judgment or enter an injunction yourselves. And Judge Smith's opinion in Hopwood says the appellate court has the power to just enter the injunction when it's clearly. On the mootness issue, I guess I don't really see any merit to the claim that as to the old policy that it's not moot. In other words, it just seems to me that it's easily moot, but as to the new one, there seems to be plenty of controversy, whether you're ultimately entitled to prevail on the merits is a different question. But I guess I don't understand the argument that the first one isn't moot, and I don't understand the argument that the new policy is moot. Right. So I agree that on mootness the new policy is an easier call. But on the original policy, it's just a voluntary cessation point, where you've got to satisfy a heavy burden to prove that this is moot based on their voluntary changes to the policy. And I understand that that's typically a harder case for a plaintiff when there's been an intervening change in law. But, number one, the district court said this is not even a voluntary cessation case, which is just wrong. I mean, this court, when there's changes in the adverse, when there's new adverse binding precedent, this court says that it's a voluntary cessation case. That's what the court did in Boudreau when it issued its opinion in McDonald. That's what it did in the freedom from religion case when the Supreme Court handed down Mattall in the middle of the case. Both of those are voluntary cessation cases. Now, why this case is different is, number one, we asked for this relief, this blinding relief to the racial data in our complaint, and we have not gotten relief sought in our complaint. That is a live dispute. It's exactly what happened in the Knox case at the Supreme Court where the defendant voluntarily did a remedy, and the plaintiff said your remedy is not good enough, it doesn't go all the way. It's what happened in Texas v. Yellen, which is a decision from this court, where the defendant voluntarily gave most of the relief but not all of it. The court said that continues to be a live dispute. And this is the use of race under a really fuzzy, holistic admissions process. This is not union fees. This is not, you know, I can tell whether the union has stopped taking my money, for example, after Janus. We cannot tell whether UT is using race or not in the admissions process, and they insist on keeping the two most powerful tools that they used to use for racial discrimination in their process. That is a continuing controversy. It harms us in the same fundamental way as this court put it in the Clark case. If we were to deny your motion for summary judgment, you'd have plenty of opportunity for discovery to figure out whether race is being used, would you not? Yes, Your Honor, that would be helpful. You said there's been no discovery. Correct. All the discovery has been on us. UT itself has not had any merits discovery into it. You said this is a voluntary secession case. In your view, what would the opposite of voluntary secession look like? How would you know if it wasn't a voluntary secession? Right. Involuntary secession occurs when you have a non-party, like a legislature, that passes a law that eliminates the challenge policy. So that's not voluntary. It's not done by the defendants in the case. It's done by some outsider, and that compels them. That was the facts in the Aud Bonnock decision and Dave's that they cite. The Ninth Circuit has a case that we cite called Bell that says that involuntary secession is reserved for that context. When you're talking about how you react to adverse judicial precedent for which you are not a party, UT was not a party to the Harvard case, that is voluntary secession, and it's especially voluntary here. It's not like the Supreme Court said, for example, that race-based affirmative action was fine until 2023, and now, going forward, it's illegal. Harvard says these universities have always been violating, even Grutter and Fisher. They've not been taking the principles from those cases seriously, and so UT had a decision to make. It could either do what it did, or I think it could have said, you know, we're not using race like those schools were. Harvard said these universities. You're talking about Harvard and UNC. Correct, and then at the end of the opinion, it says many, many universities have been doing it this way. We understand that, but it says our precedents have never allowed race to be used in this way. So as regards all these other universities, it's a voluntary secession situation. Correct, and especially with UT. I mean, Harvard cites Fisher, too, as precedent and says UT is sui generis because it has the top 10% plan that really constrains how it does admissions for 75% of the class. We fully expected UT to latch onto that and say we're different, and we're actually distinguishable from Harvard and UNC because of the top 10% plan. Of course, we would have fought them on that, but that is an option that was available to them. They also could have done, I mean, I've been litigating against the military academies for a couple of years because they've asserted a new interest for using race in admissions. That was available to UT as well. My friends for the interveners agree. They've put out Q&As, and in their brief, they've reaffirmed that universities are not, in their view, are not forbidden from using race in admissions, only forbidden from asserting the diversity interest that Harvard rejects. So UT had lots of options, and UT has been aggressive in litigating this issue. I mean, Judge Smith, between Hopwood 2 and Hopwood 3, UT actually asked this court to overrule Hopwood 2 in Hopwood 3 and re-litigated that question all over again. It could have kept fighting and has shown a penchant for doing so. This is a voluntary choice, and we still don't know why, what it was in Harvard, which of those precedents that UT thought its own policy was violating. They haven't really said. It looks to us like a decision, a tactical decision, that this is not the right time for us to press our position rather than a permanent change. If I understand, I mean, I'm seeing different views about what the Harvard decision actually entails with respect to complying with it. You're saying you should do these 10 things or these 15 things. It seems like your friends on the other side are saying, well, we've done these 8 things or these 6 things or these 9 things, and we need not do these other things to comply with it. Is that fair? Yes. Right. And that is, I'm trying to find the case in my notes, I believe it's called Crocker is a recent case from this court where the defendant gave 90% of what was in the plaintiff's complaint away. It's an Air Force vaccine case. Exactly. But the remaining 10% of the complaint was not addressed, and that part meant that they didn't satisfy their burden. Yeah, by contrast, I mean, I was on both panels of that one in the Navy SEALs case. In the Navy SEALs case, in my view, I wrote the majority opinion, and the Navy and the Congress had done like 174 things to make sure that nobody's ever punished for not having taken the COVID vaccine, and so I wrote an opinion saying that it was moot and that it wasn't voluntary secession because they had no choice. Right. Right. And that's a different – so if the Texas legislature had stepped in here, this case would be moot, but they have not. My friend's changes to their policies, from what we can tell, are just edits to PowerPoints and training documents. They're not formal in any sense. This court in the FinVez decision said that kind of sort of wholly executive action does not carry much weight. They point to the Board of Regents doing something, right? The Board of Regents repealed a rule that said that universities can decide whether to use race in light of Grutter. So the Board of Regents may have a stronger case for themselves being dismissed as moot than the UT defendants, but we don't think they do either. There's no evidence in the record from the Regents about what their future intentions are. And if you look at the statutes – Does the Board of Regents' action forbid the use of race in any way? Nothing in the rules. I was going to say that the Regents' rules say that now, if you look at them as they exist today, they say that UT and the individual universities, it is up to them which criteria they consider under holistic review. And if you look at the statutes, the Texas Education Code 51.805B18, the statutes as they exist says that the individual universities can consider any other factor that they deem necessary to their mission in the admissions process. So while that sort of permission has been revoked, there is no ban on using race. And now if you look at the statutes and the rules as they exist, there is complete discretion for UT to do whatever it wants. It just sounds to me like you're saying they don't have to comply with Supreme Court law until the state of Texas says they do. That's not what you're saying? Of course they have to comply. The fact that they can't satisfy Supreme Court precedent means we're entitled to judgment. It doesn't make the case move. They had options after the Supreme Court's decision to continue defending their race-based admissions policy. They decided not to, but in deciding not to, they maintained the two most powerful tools that they were using in the past to discriminate as well as other universities. There's no statement in the record that this change is permanent. We know it's not permanent because as soon as Grutter overruled Hopwood, they switched back. That's what I heard you say. If the Texas legislature stepped in, then there wouldn't be this lawsuit. That's not what you're saying? If the Texas legislature had banned the use of race at UT, this would be moved. That's our position. But that has not happened. In fact, the Texas laws as they exist allow UT to consider whatever factor it wants to in the admissions process. And the Texas legislature actually did. There was a law that said if the Supreme Court ever outlaws affirmative action. So if the Texas legislature did something, you wouldn't be concerned about what Texas is actually doing. You'd just be concerned about what the legislature ordered them to do, I guess, by way of a statute. We would be concerned. I mean, we would be concerned. It's just that when you're literally being compelled by an outside force, that is not a case of voluntary cessation. So the original policy would be moved in that circumstance. Now, if they were doing what they're doing now and continue to see the racial checkbox data and use that aggregation tool, we could bring a lawsuit or continue the lawsuit against those aspects of the admissions process. But this court has recognized that when a legislature does something, that is different than when the defendant themselves do something. Do you know whether that aggregation data you referred to, I think the parties talk about what is it called, a dashboard? Yes. In the briefing. Is there any data that postdates this change? In other words, an admitted class that has come in under the new policy? Right. So caveat that this is not in the record because the district court dismissed us before even the first year. Sure, but that's why I said the dashboard is discussed in the parties' briefs. Right, right. And if you pull that dashboard up, they have now released the first year of data after Harvard. And you can compare by race, UT Austin only, 2023 versus 2024, so the cycle before Harvard and the cycle after Harvard. If you look at that data, the percentage of black admissions does not move. It is 16% both years. The percentage of Hispanic admissions moves one percentage point. It goes down one percentage point. That is not the type of change we would have expected if there had been major overhauls to the admissions process. And we do cite that dashboard, as you note in the record. The current version you could look at today, you'd see no movement, which is highly suspicious if they've really overhauled their admissions process. Well, that would certainly be evidence that one might be interested in in order to evaluate the new policy. I mean, maybe there's all sorts of other evidence. I don't know. Right. And it would be conclusive evidence under the desegregation decisions that say even if this blinding aggregation stuff is not required by the law, if it is traceable to your prior discriminatory system, you have an affirmative duty to get rid of it, especially if it has continued discriminatory effects, which is what that data would show. Unless the Court has further questions. You've saved time for rebuttal. Thank you. Thank you. Mr. Christian. May it please the Court. The reason this case is moot is because in response to SFFA versus Harvard, UT adopted a new policy that eliminates the use of race and ethnicities in admissions. The claim in this case was that UT is violating the Constitution and other laws by racially discriminating against applicants by the use of race and ethnicity in the admissions process. We have adopted an official policy that eliminates that from consideration. But they say that you're still doing so, which makes it not a moot controversy. It may be a controversy in which you ultimately will prevail by saying that the facts show that you're not using race. But that's a completely different consideration from whether there is no case or controversy. Your Honor, I think what I want to talk about is a standard review a little bit. You know, mootness is a legal question, but it's based on facts, facts that this district court found. As a matter of fact, based on the evidence that we submitted, the district court found that our admissions process is race neutral, that we do not use race or ethnicity in admissions. In what respect did you present evidence, if there's been no discovery from you? We submitted a declaration and a supplemental declaration from our vice provost of admissions, which described the old policy, the reason that we made the changes because of the FFA decision, and in detail what the new policy was. And while there was no formal discovery with depositions and the like, we voluntarily agreed to answer questions that were in the form of interrogatories, essentially, that SFFA posed to UT Austin, and those are in the record as well. There was the opportunity for either side to request fuller discovery if they wanted to, but neither party did. The district court decided this on the evidence that was submitted to it, and based on that evidence found not only that our admissions process is race neutral, but that the concerns that SFFA is raising here about the checkbox data and the dashboard data were speculative and unfounded, that there is no evidence that those pieces of information play any role in the admissions process. And absent some non-speculative contention that UT Austin still uses race in deciding who gets into the school, the case is moot. There's no effectual relief that the court can grant beyond the fact that UT Austin has abandoned, as its official policy, the use of race in admissions. And it's, of course, not just UT Austin, but the regents who repealed the rule that previously authorized the use of race in admissions. And they didn't just repeal the rule. The reasoning that they give in the official minutes is because of the SFFA decision, which they say prohibits the use of race in admissions, and directed its general counsel to make all changes necessary to ensure that admissions policies going forward do not use race. Now, I want to talk a little bit about some of the facts here in our admissions process. We employ about 100 temporary seasonal workers for the sole purpose of holistic review. That's all they do is they come in and they help work us through the thousands and thousands of applications we get each year by doing that holistic review process. They have no access to the checkbox data. They have no access to the dashboard data. They're not full-time employees, and they don't have full access to the administration's computer system. Of course, I think it's undisputed that we strip out that checkbox data from the application file and that the module that is presented to these reviewers does not contain that, does not contain any dashboard data or anything like that. And those file reviewers are strictly instructed not to look outside the materials presented to them, and that is how that part of the application process is done. The people in the admissions office who have sort of access to this checkbox data and dashboard data have essentially dual roles within the admissions office. They may play a role in admissions and recruiting. They may be supervisory officials who oversee the whole office, but they have legitimate reasons to access this data for state reporting purposes, for recruiting purposes as part of their job, and the fact that they also have admissions duties as well and may come in contact with the holistic review process, mainly in the context of resolving disparate scores of a holistic review applicant. In those circumstances, they can be instructed and follow those instructions to not access that data for an unlawful purpose of considering that in admissions. Let me see if I understand what you said, Mr. Christian. There are seasonal employees who do holistic review. Yes. They don't have access to the checkbox data or the aggregation data. That's right. But you did say, and I appreciate the candor, that there are people in the admissions process who do have access to it, and they do have some decision-making authority over admissions. They do have access to the checkbox and the aggregation data, but you're saying they are not using it with respect to admissions. Yes, that is our policy, and that's how they are instructed, and there is no evidence that anyone has ever disregarded that policy. I guess that's my follow-up, is we don't have evidence, do we, or maybe we do, about how actually this process caches out the new policy in terms of what are the racial characteristics of the incoming class under such a policy. Wouldn't that be relevant evidence as to whether race, in fact, is factoring in in some way, maybe despite what the policy is saying? I don't know. That could be, but that is, I guess, the subject of potentially a different suit. If there's going forward some allegation that we are not following our policy or have some kind of secret policy that is discriminating on the basis of race going forward, then that is a different type of claim that's being made in this lawsuit. This complaint challenges our old policy and says that we need to get rid of race and ethnicity in the way we administer our admissions process. So why would you not want, as an institution, why would you not want an injunction that says that those officials whom we were just talking about may not use race in the admissions process in contravention of the Harvard decision or any other relevant decision? Why would that not protect the institution and also, of course, subject those who might violate that injunction to particular sanctions as a court might find appropriate? Well, I guess, Your Honor, we don't believe any such injunction is necessary, nor is it warranted in the absence of some— No, but my question is, why wouldn't it help you? Why wouldn't you say, yes, you know, this is fine with us. We're not doing it anyway, so go ahead and enter an injunction so that everyone can be absolutely certain and so that any particular one of our officials who might stray in that policy will be held accountable? I just—the institution believes it's capable of enforcing its policy. If any officer or official were to violate that policy, they certainly would be disciplined if not fired. I don't think there's any need for an injunction to give the university any kind of incentive to do that as well. And, Your Honor, I think the initial decision in the Hopwood case that you authored speaks a little bit to the discretion that can be afforded to admissions officers to comply with the law and come up with their own procedures for doing so. The district court in that case did not enter an injunction with respect to the admissions policy that the law school was using. This court held that those policies were unconstitutional, that race could not be used, but declined to reverse the decision not to enjoin the law school in that case, expressing confidence that the admissions officers, acting in good faith, would comply with this court's decision. And the University of Texas at Austin overhauled their undergraduate admissions process in response to the law laid down in Hopwood I. We eliminated race and went to a holistic review process that did not take race into account. There was no claim that we had to blind everyone to the checkbox data or those kind of claims that are being now. But for years, we operated a race-neutral holistic review process. The legislature did part of that, didn't it, after Hopwood? After Hopwood, the legislature adopted the 10 percent rule, but they did not tinker with our holistic review process. So after the 10 percent rule was put in place, we continued to use the holistic review process in a race-neutral way until the law changed again in the Grutter decision when we introduced race in compliance with the Supreme Court's directives in that case. In the university's view, I mean, a lot of these decisions, Hopwood and Fisher and this new one, are about means versus ends. In the university's view, is racial diversity in higher education a compelling state interest? No, not any longer, Your Honor. I think that is the key takeaway for the university from the SFFA decision, is that we could no longer use on that same compelling interest that we had prevailed on in the Fisher case to justify the use of race in our admissions process after SFFA. So that is what we believe compelled us to make a change to our admissions policy to eliminate the use of race and ethnicity. Okay, you're saying racial diversity is no longer a compelling interest? No longer a compelling interest. I believe it's still a worthy goal to achieve, but it cannot be achieved through race-conscious means in the admissions process. Well, I mean, there's a question of means, right? I think it should be. Well, the use of balancing racial pluses or minuses I would think is no longer a constitutional means. Right. But the ends, I hear what you're saying. You're saying it's no longer a compelling state interest. Okay. And so I want to talk about the voluntary cessation exception as well. First, we contend that because of the change in the law, because we were compelled to bring our admissions policy in compliance with the Supreme Court's decision in SFFA, that this change was not voluntary. In this Court's Daves v. Dallas County case, this Court recognized that a policy change compelled by a change in the law is not voluntary. That case was a statutory change, not a Supreme Court decision, but we are obligated to follow the decisions of this Court and the Supreme Court, and when there is a change in the law that we realize that brings us out of compliance with what the Court is saying is necessary to do, we are compelled to make that change, just as if the legislature told us to do something. It makes no significant difference for purposes of voluntary exception, cessation doctrine. So at the beginning, it's not voluntary. That exception doesn't apply. But second, we believe that our change was made in good faith. In particular, again, the timing of the decision, this was not like a decision to avoid imminent judgment or a trial or some kind of gamesmanship. It was in response to the SFFA decision. Schools across the country, whether they were in litigation or not, revised their admissions procedures in response to that decision, and so that shows or supports that our decision to make our changes to our admissions policy was in good faith and that there is no reasonable expectation that we will return to our old ways. Again, our vice provost's declaration explains that one of the policy changes that we have made is an annual post-cycle review to make sure that policies that we have put in place to ensure that there's no consideration of race and ethnicity admissions, that those are being followed, and that we will revise our policies as necessary to make sure that our admissions policies going forward are race neutral. In the dialogue, of course, which you heard with Mr. Norris, there was mention of the dashboard information, which he acknowledged is not in the record. If we were to decide that the current policy, that that is not moot, and were to decide that the plaintiffs are not entitled to summary judgment at this point, either here or in the district court, why would it not be a good idea for this case to be remanded to the district court to explore evidence such as the dashboard information and obviously lots of other potential depositions and interrogatories, live testimony, whatever. You heard the statistics that were mentioned from the dashboard. Why is that not interesting and probative potentially as to whether race is still being used? Well, Your Honor, I think that, again, I go back to the district court's finding of fact, based on the evidence that it had before it, of the policy changes that we have made, that we aren't using race. So, yes, if the court were to determine that the case is not moot and send it back down, then we can have a bunch of discovery or we will vigorously defend the policy that we've put in place, but at the end of the day, we're not using race to make admissions decisions one way or the other. That's what the undisputed evidence shows as submitted by our provost. The district court found that and found that the concerns expressed by SFFA were speculative and unwarranted. So there is no basis, I would end by saying that we need to send this back down to develop discovery further. Again, if in the future some evidence arises that UT has changed its policies in some way, that is reintroducing race or that we are, again, have some kind of unwritten policy that we're following that is unlawful in some way, these plaintiffs or some others are entitled to bring another suit to challenge our policies again. Well, do you concede that your admissions officers have access to race data during the review process? Yes. Why do they need it during the review process? For reporting requirements required by state law and for recruiting purposes of admitted students. So the reports are due during the time they're reviewing applications? There is a report due at the end of the admission cycle, but the checkbox data needs to be reported to the higher education board on a more rolling basis, I believe. So it's not just a one-time report. It's an ongoing obligation to update. Throughout the course of an academic year. That's my understanding, Your Honor, yes. But, and again, we have admissions officers whose duties include recruiting students who have been admitted to make sure that they enroll. And so those persons have access to that data for that purpose as well. And we think that they can do, you know, walk and chew gum at the same time. They're capable of doing two important jobs at the same time. They're capable of performing those reporting and recruiting duties and supervising the admissions process as required with the instruction, the clear instruction, that they may not use that data in the application review process. They may not consider anyone's race or ethnicity in making an admissions decision. And I also point out that the SFFA decision itself recognizes that the complete removal of all evidence of a person's race from an application file is impracticable, if not impossible. Essays, letters of recommendation, self-submitted materials by the applicant or the people supporting the applicant are inevitably going to disclose what that person's race or ethnicity is. So, and the Supreme Court provided guidance, which we have incorporated into our training materials and our policies on how to address those situations so that even if there is some indication of what an applicant's race or ethnicity is, that the application decision is made on the merits without regard to that race or ethnicity, that they can take into account the personal characteristics of that applicant but not make a decision based on race or ethnicity. So we believe we're in full compliance with that and that there is no basis for any kind of injunction going forward, that the plaintiffs have essentially gotten the effective relief that they have asked for in their complaint, which is a race-neutral admissions process at the University of Texas. Do you agree that there's some ambiguity in how the district court ruled in that the district court both said that it's moot and that he declined to enter an injunction? It sounds like the district court maybe was trying to have it both ways, to rule on the merits but to say that it's moot. How do you read that? Two things. I think I read what the district court did was to analyze whether there was any effectual relief that was still remaining to be awarded to the plaintiff after the changes in our admissions policy. That's a mootness analysis. And in that regard, it said that there's nothing left to enjoin with respect to the race neutrality of this admissions process. So it went through the analysis of the injunctive relief and the appropriateness of it in determining whether there was any live claim left on mootness grounds. And the other point I want to make before my time runs out is that there are several cases... If there's something you haven't been able to address, we can give you a couple more minutes. Okay. We're not terribly rushed here, and we want to hear the case fully, just so you don't repeat yourself. Oh, I appreciate that, Your Honor. I wanted to kind of address the mootness standard, which is not that the plaintiff is getting everything that they are asking for, but whether they are getting all the effectual relief they are asking for. There are several examples of cases where a case was moot, even though the plaintiff was complaining, hey, there's still harm being caused. We still need the court to address that. One case is this Nike versus Already out of the Supreme Court. It was a trademark dispute. Nike had a trademark for its shoes that this competitor was accused of violating during the litigation, and the competitor had a counterclaim to invalidate the trademark. As the litigation progressed, Nike decided to dismiss their claim, and they entered a covenant not to sue on the trademark against the competitor Already. Already said, that's not good enough. We need this trademark invalidated. And they submitted evidence that people would invest in their company if this trademark were still around, that their retailers would not carry their products, and the Supreme Court said, no, this case is moot. The fact that Nike has agreed not to sue you for violation of the trademark is enough relief to give you everything effectively that you've asked for in your counterclaim. And so even though you didn't get the precise relief in your prayer for relief of invalidating the trademark, the case is moot. Dallas versus Davies out of this court is another example en banc where the plaintiffs were vigorously complaining that the changes to the Dallas County bail policies were still unconstitutional, were still violating their rights. And this court said, no, those changes address the complaints that you had against the old policy, and if you've got complaints about the new policy, then we're going to have to, you know, you're going to have to address that in a separate lawsuit. But the claims that you brought here, the relief that you've asked for, has been afforded by the change in the policy, and the case is moot. And I think the same is here. The live complaint in this case challenges only our old policy, seeks to prevent us from using race in the admissions process, and we have adopted policies that do that, that ensure that race and ethnicity are not going to be used in admissions decisions. Because of those changes, as found by the district court, this case is moot. All right. Thank you, Mr. Christian. Ms. Saleh, I hope I'm pronouncing that right, but correct me if I didn't. Good morning. My name is Sumaya Saleh, and I'm here on behalf of the student interveners, a multiracial group of students and student organizations at UT Austin who have an interest in protecting lawful ways to ensure diversity on campus, a goal that the Supreme Court commended in the SFFA versus Harvard opinion. I want to start with the fact that SFFA's arguments in this case hinge on, number one, a lot of conjecture about what might happen if UT Austin violates its new policy that explicitly prohibits the consideration of race as a factor in undergraduate admissions decisions, but also that SFFA is conflating the use of race with access to racial data. And mere access to racial data is not discriminatory. Collecting race or ethnicity data is not discriminatory. At its core, equal protection is about the unequal treatment of people. And so if there's no unequal treatment, if there's no impermissible use of that data, then there's no equal protection problem. So it would be okay under Supreme Court precedent, in your view, if even those 100 temporary workers who've been discussed here today had full access to all of the checkbox and other racial data just so long as they didn't allow that data to influence their decisions? There's nothing in the Harvard decision that prohibits that access. And as Mr. Christian was just saying, the Supreme Court recognized that it's impractical to completely blind admissions officers, so that would not create a per se problem. I think UT Austin here has instituted the safeguards that it needs to ensure that race is not used improperly by not giving. They took measures beyond what Harvard requires by making sure that those seasonal workers don't have access to the race or ethnicity data, by very explicitly instructing them that they're not permitted to consider race or ethnicity at any point as a basis for making admissions decisions, and giving them really explicit instructions about what to do if an applicant voluntarily self-discloses that data, whether it's in their personal statement or it comes up in a recommendation letter. And I really encourage this court to look carefully at the training materials that UT Austin is using, because they not only reflect a very clear understanding of what the Harvard decision stands for about the impermissible use of data and what UT's legal obligations are pursuant to that, but they're also very comprehensive in instructing the admissions officers or the admissions reviewers about what to do if that information comes up in the review process, because they're focused on where the constitutional violation might lie, which is the impermissible use of that data in making an admissions decision. So in your view, the withdrawal of the racial checkbox data was not required by the Harvard decision from the decision-making process? There is nothing about the Harvard decision that requires that to be scrubbed. I think it's a helpful step, and that's why UT Austin and universities across the country have taken steps like that, because it helps mitigate the potential risk there. But at the end of the day, this firewall that SFFA is asking for is not legally required. It's not something that they're legally entitled to, because Harvard itself talks about what you do when you do know an applicant's race. Okay. So in your view, the Harvard decision doesn't, I guess, guarantee as a constitutional matter a race-blind admissions process? It does not, Your Honor. Okay. It focuses on, because of what equal protection is about, it's about treating people differently on the basis of race. It focuses on what you do when you have access to that. But it doesn't have to be colorblind? That's correct. Okay. You know, I'm just curious. Do you all agree with the university that racial diversity in higher education is no longer a compelling interest after Harvard? I believe that's a very difficult, compelling interest to defend after the Harvard decision. It's possible. I mean, I think in the council for SFFA mentioned the military academy cases where the Harvard decision talks about how there might be a compelling interest in diversity there. I think it really boils down to the details, but given what the Supreme Court said about the lack of compelling interest in the way that Harvard and UNC were using race-based data, I think that's a difficult interest to defend going forward. The other thing I wanted to touch on is that this case really boils down to bedrock principles of mootness. And there's all this talk about, like, what can we learn about what's happening with the new policy? But you don't even get to that question if the case is moot. And I think, Judge Duncan, your opinion in the Navy SEALs case is really instructive on that point because it makes clear that when a challenged policy is rescinded, a case is moot. It's as simple as that. And then as even further evidence of mootness, you consider whether there's any effectual relief whatever that can be provided to the plaintiff in the case. And the answer here is very simply no. When SFFA filed this case in 2020 challenging UT Austin's old admissions policy, it saw an injunction seeking two types of relief. First, they wanted an injunction that prohibited UT Austin from using race in admissions decisions. And second, it wanted to ensure that the admissions process was conducted in a way that ensured that the people making decisions were not making decisions based off of an applicant's race. And UT Austin's response to the Harvard decision accomplished both of those goals. I think the safeguards that UT Austin has put in place to ensure that admissions officers or reviewers are not relying on race in admissions decisions make clear that that conduct is no longer happening. And as the district court found, UT Austin's current new policy is race neutral, right? And SFFA has not contended that that factual finding is clearly erroneous, nor could it, I think, on the very comprehensive description of what the new policy looks like in this case. But the further relief requested is easy to identify. It's the firewall. Well, that's where the argument that Mr. Christian was just making comes in because there's a limit, right? Like a plaintiff can ask for whatever they want in their complaint, in their pleadings, but that has to be constrained by what they're legally entitled to. And Harvard does not entitle them to that firewall. The fact that other universities, that UNC, that Harvard and Yale, instituted that firewall as a voluntary measure in order to settle litigation with SFFA does not mean that that's something that SFFA is entitled to in any case going forward. Those settlements or the resolution of those cases are not what set the constitutional floor. The constitutional floor is set by the Supreme Court in the Harvard decision. And under the en banc Fifth Circuit's decision in Dave's, any opinion about whether the new policy is lawful or not would constitute an impermissible advisory opinion from this court because the old policy is moot. And of course, once there's been a finding of mootness, the next question becomes, well, is there an exception to mootness, right? And the exception that SFFA has invoked here is voluntary cessation. But as the district court found, voluntary cessation isn't triggered here because the action that UT Austin took in first the Board of Regents rescinding or deleting the old policy because of Harvard and then UT Austin's subsequent changes to the way the admissions process works were not voluntary. They were compelled by the change in Supreme Court law. And I think the Third Circuit's decision in the Hartnett case is really, the analysis there is really instructive because it makes clear that voluntary cessation talks about a unilateral action that a party takes to change its policy in order potentially to evade litigation. And that's simply not what we have here. UT Austin defended this case for three years before the Harvard decision came down. And it was not until that watershed change in Supreme Court precedent about the permissible use of race in admissions decisions that UT Austin changed its policy because it was compelled to. It was not a voluntary choice. And the Abbott case that SFFA has relied on from this court is distinguishable because there the Fifth Circuit found that voluntary cessation applied notwithstanding a change in Supreme Court law. But the Fifth Circuit clarified that the Supreme Court case at issue in that case merely clarified the contours of the First Amendment. It was not a watershed change in precedent. I see that my time has expired, so if you have no further questions. As I said with Mr. Christian, if there's anything else that you intended to cover that you'd like to without repeating yourself, you may do so, but you don't have to. I would just briefly note that even if the voluntary cessation doctrine, if this court concluded that the voluntary cessation doctrine did apply in this case, the district court's mootness finding should be affirmed. UT Austin is entitled to a presumption of good faith. But even if it were not, I think the record clearly demonstrates that UT Austin has met a formidable burden of demonstrating that the challenge conduct is not likely to recur. The sole basis that UT Austin could previously rely on to consider race as a factor, or as a factor of a factor of a factor in undergraduate admissions, was Regents Rule 403-04. And that rule has been deleted. And so there's no basis going forward for UT Austin to consider race. And I think Judge Hendricks' opinion in the Stewart case out of the northern district of Texas has a good analysis of that question for your reference. And then because this case is moot, this court can't get to SFFA's arguments about summary judgment and a permanent injunction, so we'd simply ask that this court affirm the district court's dismissal on witness grounds. Thank you. Thank you, Ms. Alley. All right, let's give Mr. Norris seven minutes on rebuttal. Thank you, Your Honors. Judge Hendricks did not know that UT had continued to give access to admissions officers to racial checkbox data or use this aggregation tool, nor was that relief requested in the complaint. That's different from our case. Just a few additional thoughts. What do you do with, I'm sorry, please go ahead. Ms. Norris, you agreed that the Harvard decision didn't order that an admissions officer not know the race of an applicant. That's not what the decision says, is it? It says not to use race as a factor in making an admissions decision. So race alone, we're talking about the checkbox data, not race as part of an essay. We think the end of the Harvard opinion says that they have a duty to be colorblind. That information has no lawful purpose, only unlawful purposes. There's no order that they not know it. I mean, talking about a firewall and making sure they don't know it, that decision didn't say they shouldn't know it. It says they shouldn't use it. We think it says they shouldn't know it because it no longer has any lawful purpose after that decision in the admissions process. But at a minimum, it is powerful evidence that they are using it, which would also mean that this case is not moved. What do you mean you think it says they shouldn't know it? Does it say that or not? The end of the opinion, quoting Justice Harlan, talks about the colorblindness duty under the Constitution. The rest of the opinion says it eliminates the one remaining valid purpose for using this information. And the checkbox is actually super important. The problem was not universities were considering race as one small factor in a holistic review process of each individual. That was never the truth. What was actually happening was they were looking at what box you checked, awarding a racial preference based solely on that information, and then using aggregation tools to track the class and compare it to the year before and see where they were on their racial numbers. That's how they nailed their targets every single year. These tools were the most powerful ways that they were discriminating. They weren't a minor sort of extra relief that it would be nice if we could get. And my friend from UT cited Hopwood. Hopwood said there was no injunction there. That is true. But the Hopwood court said that there was a right to a declaratory judgment, saying that the existing policy there was unconstitutional. There was also a voluntary cessation fight that the plaintiff won in Hopwood, that the changes that UT had made midstream did not move the case because they were insufficient. And as I mentioned, there they were super insufficient because they continued to use race as a factor. But here they've maintained two of the key tools that were used for discrimination in the past. The appellees have made quite a bit of the fact that, as they contend, there were uncontested facts that were presented that were unrefuted and that are not clearly erroneous. What do we do with that? I don't think that's accurate, Your Honor. There are some self-serving declarations from one vice provost that says here's what our process is. That exists. They didn't move for summary judgment and argue that there's no material dispute of fact about what UT is doing. If they had, we would have cited Rule 56D or F that says you can't resolve that without discovery of the merits of your policy and what you're actually doing. We move for summary judgment because we have two arguments that we think there is no genuine dispute about. Number one was the original policy unconstitutional. My friends are not resisting that, so it's uncontested. And number two, did they have an affirmative duty to get rid of all aspects of their prior discriminatory policy, including this aggregation? So, I mean, as I understand your question, you're saying we are not presented here with uncontested findings of uncontested fact. Correct. They say they've removed this from the seasonal review files. They say that it would violate our PowerPoint for anyone to access it. That's all fine. We say that, backed up by the EEOC, that if you're asking for this information and making it accessible, there is a strong presumption you're using it in the decision-making process. So it is a disputed fact. They have to come forward with some valid reason. My friend still has not given you a reason why they need to access this during the admissions process. I think for the first time I heard that they have an ongoing duty to report, to keep this database updated. That is not true. There's a statute on this. It's Texas Education Code 51.4032. That's the reporting obligation. It says the data is due on December 1st, about the cycle that ended many months ago, and it says the data you need to give us is about the entering class. That's the enrolled students, not the admitted students. There is no obligation to run a tool that gives you a constant live update of the racial composition of the class. That's what Harvard was doing to racially discriminate. And so, you know, why do we care? We care because this is a prior discriminator continuing to use a holistic process that is entirely impenetrable. There is the same gamesmanship concern here that exists in the voluntary cessation cases, that once the bright lights of litigation and discovery are turned off, that UT can go back to using its impenetrable subjective system to continue to use race. And when it makes that data available to its admissions officers, unlike every other school in the country that we're aware of, that is the problem. And we're allowed to at least litigate over whether that's legal or not or whether we're entitled to that relief. UT has spent more money to paying its private lawyers to litigate this case than it would take to just fix this system, to block this information during the admissions process like Harvard does. Doing what Harvard did is not a high bar. We're not setting the bar too high here. That is the bare minimum relief that we think is necessary to get into compliance with Harvard and to eliminate the constitutional violation here. So this case, I think I would point, if I could point the court to one case, it's this court's decision in Atkins. It's an older case during the desegregation era, but it has very similar facts. There was a state discriminator that had a long history of intentional discrimination. It was applying a very subjective standard where it was hard to tell what was and was not being considered. And they made a deliberate decision not to take any notes. They told the voting officials there, don't write down what questions you ask voters to see whether they're qualified and don't write down their answers. If you look at page 1690 of the record, we've got the same instruction from UT. Don't take notes about race in the application file. And the last thing I'll say that's similar to that case, this is not like Nike where there's a commitment to not sue somebody over a trademark. This is a situation where there is potential racial discrimination going on in a subjective, hard-to-detect system. And I think one of the most troubling things is my friend said that they actually used this checkbox information by admissions officers during the admissions process for recruitment. I don't know what a checkbox about someone's race has to say about why or how hard they should be recruited to come to UT, but it is highly unlikely that the same people using that information, race alone, race per se is what this court said in Hopwood. They're using race per se to recruit students to come to UT and are somehow not using that information in any respect, consciously or subconsciously, when deciding who gets in to UT in the first place. So we ask the court to reverse the dismissal of our case and to order or grant itself effective relief. All right, thank you, Mr. Norris. Your case is under submission and the court is in recess under the usual order. Thank you.